## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**KINGSLEY MADIKAEGBU,**

　　　　　Plaintiff,

v.

**GOOGLE LLC,**

　　　　　Defendant.

Civil Action No.: _____

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff Kingsley Madikaegbu ("Plaintiff" or "Madikaegbu"), by and through undersigned counsel, hereby brings this action against Defendant Google LLC ("Defendant" or "Google") for retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a); 42 U.S.C. § 1981; and the District of Columbia Human Rights Act ("DCHRA"), D.C. Code §§ 2-1401.01 et seq. In support thereof, Plaintiff states as follows:

## PARTIES, JURISDICTION, AND VENUE

1.　　　Plaintiff Kingsley Madikaegbu is an adult citizen of the United States domiciled in Washington, D.C. At all times relevant to this action, Plaintiff lived and primarily worked from home in the District of Columbia.

2.　　　Defendant Google LLC is a Delaware limited liability company with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California 94043. Upon information and belief, the sole member of Google LLC is XXVI Holdings Inc., a Delaware

corporation with its principal place of business in California, such that Google LLC is a citizen of Delaware and California for purposes of diversity jurisdiction. Defendant conducts substantial business in the District of Columbia and employs more than 500 employees nationwide.

3. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) because this action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., and 42 U.S.C. § 1981. This Court has supplemental jurisdiction over Plaintiff's DCHRA claims pursuant to 28 U.S.C. § 1367 because those claims arise from the same nucleus of operative facts.

4. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in the District of Columbia, Plaintiff worked in the District of Columbia, and the unlawful employment practices were committed in the District of Columbia.

6. Plaintiff has satisfied all administrative prerequisites for his Title VII claims. Plaintiff timely filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission, Charge No. 570-2025-03117, which was dual-filed with the D.C. Office of Human Rights pursuant to the agencies' worksharing agreement; the D.C. Office of Human Rights acknowledged the charge and deferred its investigation to the EEOC. Plaintiff has requested a Notice of Right to Sue from the EEOC and the EEOC issued a Right to Sue letter to him on or about May 27, 2026. This action is filed within the 90-day period of receiving the Right to Sue letter.

## FACTUAL ALLEGATIONS

### A.     Background and Employment

7.      Google LLC is a wholly owned subsidiary of Alphabet Inc. and one of the world's largest technology companies. Google Cloud is a rapidly growing division providing cloud computing services to enterprise clients worldwide through its Professional Services Organization ("PSO").

8.      Google hired Plaintiff as an Infrastructure Cloud Consultant within Google Cloud PSO. In that role, Plaintiff supported critical cloud infrastructure initiatives and provided expert consulting to major enterprise clients, including Verizon, Accenture, and HP. Plaintiff delivered high-impact technical solutions and was recognized by clients and peers for his contributions throughout his tenure.

9.      Plaintiff worked primarily from his home in Washington, D.C.

10.     In approximately 2022, Plaintiff began reporting to Robin Brown ("Brown"). Before reporting to Brown, Plaintiff had received consistently high performance ratings from every prior supervisor at Google. Brown herself awarded Plaintiff a "Significant Impact" rating in his 2022 annual review, before any protected activity had occurred.

### B.     The GPC Removal and Plaintiff's Protected Complaints of Racial Bias

11.     On May 30, 2023, Plaintiff was assigned to an Apigee consulting project for customer Genuine Parts Company ("GPC") alongside colleagues Jose and Elie.

12.     Despite minor technical difficulties during the kickoff call, the team met its objectives and developed a path forward.

13.     On May 31, 2023, Brown informed Plaintiff that GPC had requested his removal from the engagement. Google removed Plaintiff, the only person of color on the team, and replaced him with two Caucasian colleagues.

14.     On June 1, 2023, Plaintiff asked Brown directly why he had been removed. The explanations offered were vague and shifting, referencing technical issues with the kickoff call. She advised Plaintiff to contact HR if he believed discrimination was involved.

15.     In August 2023, Plaintiff submitted a written complaint in Brown's manager feedback survey, stating in part:

> *Robin should pay closer attention to how implicit bias could affect people of color in her team. In a recent situation, a customer requested the removal of a team member after a less than ideal kickoff meeting. As the only person of color on the team that was asked to be replaced, the individual couldn't help but wonder if implicit bias played a role in the customer's decision.*

16.     This written submission constituted protected activity under Title VII, 42 U.S.C. § 1981, and the DCHRA. Plaintiff opposed conduct he reasonably and in good faith believed constituted race discrimination.

### C.  Brown's Direct Admissions of Retaliatory Animus

17.      Following Plaintiff's August 2023 complaint, Brown's treatment of Plaintiff changed markedly. She began canceling their regularly scheduled one-on-one meetings, reduced contact, and adopted an increasingly critical and hostile tone.

18.     On or about January 9, 2024, during a meeting aimed at rebuilding their working relationship, Brown made statements that constitute direct evidence of retaliatory animus. Brown told Plaintiff, in sum and substance, that his racial bias feedback had "triggered" her because she has racists in her family, and that she did not know how to work with him going forward.

19.    Brown's statements that Plaintiff's racial bias complaint had "triggered" her and that she "did not know how to work with" him after he raised it constitute direct evidence that Brown's subsequent adverse treatment of Plaintiff was motivated by his protected activity.

20.    Brown's statements are corroborated by Google's own subsequent admissions. Google's Employee Relations investigator later recited Brown's statements—including that "race was a trigger for her because she has racists in her family"—and confirmed that Brown "received coaching on her intent versus the impact of sharing stories like that." And on January 25, 2024, Plaintiff referenced Brown's statements to her directly; Brown did not deny making them and instead explained what "those words were to convey."

21.    Plaintiff's skip-level manager Matt Dauphinée ("Dauphinée") subsequently confirmed to Plaintiff that Brown had found his implicit bias feedback "crushing" and "a punch in the gut," that Brown "was in a very bad way after that feedback," and that Brown had "been trying to manage that since then"—further corroborating that Brown's hostility toward Plaintiff was directly connected to, caused by, and continued to be influenced by his protected complaints.

22.    Brown herself contemporaneously understood Plaintiff's complaints to be complaints of unlawful race discrimination. In the January 25, 2024 conversation, after Plaintiff stated that there was "very clear indication of bias" in his removal from the GPC engagement, Brown responded that race "is a protected field at the US law level," that "people can sue," and that she was therefore obligated to "reach out to HR because you've brought it up again."

### D.  The Retaliatory 2023 Performance Rating

23.     On January 25, 2024, Brown delivered Plaintiff's 2023 annual performance review. Despite written feedback in the review itself praising Plaintiff as "a trusted advisor internally and externally on Apigee," acknowledging that he "jumped into several customers

with little context and was able to deliver strong solutions," and recognizing his contributions to cross-functional go-to-market strategy, Brown assigned Plaintiff a "Moderate Impact" rating— the second-lowest of Google's five-tier GRAD performance scale and a rating signaling below-expectations performance.

24.     Under Google's GRAD framework, the majority of employees are expected to receive a "Significant Impact" rating. A "Moderate Impact" rating triggers additional managerial oversight and places an employee on an informal corrective track. Plaintiff was never told he was on such a track, never placed on a Performance Improvement Plan, and never told his employment was in jeopardy.

25.     When Plaintiff challenged the factual basis for Brown's stated justifications for the low rating during the January 25, 2024 conversation, Brown retreated from several of her stated rationales: she assured Plaintiff that she "wouldn't worry about getting kicked off this account," told him the GPC removal "didn't even come up in your annual review" or his progress report, and acknowledged that she still did not know what the account team had actually said about the reasons for his removal.

26.     By Google's own account, Brown initially assigned Plaintiff a "Significant Impact" rating for 2023, which was downgraded to "Moderate Impact" during an organizational calibration process. Plaintiff received no advance notice that his rating had been downgraded, and no formal corrective action accompanied the downgraded rating.

### E.  Retaliation Continues After Brown's Maternity Leave

27.     Brown went on maternity leave from approximately February through October 2024. During her absence, Plaintiff reported to Margaret Southall ("Margaret"). Plaintiff was not placed on any formal corrective action during Brown's absence.

28.     Upon returning from maternity leave in October 2024, Brown immediately resumed targeting Plaintiff. She reintroduced negative feedback from prior years and made factually false accusations—including that Plaintiff had failed to read a pre-read document for an engagement when no such pre-read or statement of work had been provided to him.

29.     On November 1, 2024, Brown met with Plaintiff to discuss alleged performance deficiencies. The written follow-up to that meeting did not contain a formal warning, did not reference imminent termination, and did not constitute a Performance Improvement Plan. It pointed to general goals and resources.

30.     On November 20, 2024, Brown sent an email to Plaintiff with the subject "Following up on Specific Feedback."  Reaching back over the prior year and a half, the document resurrected the 2023 GPC removal, the very engagement that had prompted Plaintiff's original discrimination complaint, and recast it as an ongoing accountability failure, faulting Plaintiff for how he had responded to the removal rather than identifying any deficiency in his work. In that email, Brown specifically cited Plaintiff's discrimination as part of his alleged failure to take accountability, recording that he had "hinted at discrimination" in his removal as though his protected opposition were itself a performance shortcoming. That same document became part of the basis Google relied upon to justify the "Moderate Impact" rating and Plaintiff's termination.

**F. Pretextual Travel Policy Confrontation**

31.     In late October 2024, Plaintiff was asked by the project team to substitute for a departing colleague, Paul Williams, on a customer engagement in São Paulo, Brazil with client C6 Bank. Plaintiff was informed by the project team that the trip had been approved and that the customer had budgeted for the travel.

32.     Plaintiff notified Brown by email on December 5, 2024, before his December 9, 2024 departure, that he would be traveling to Brazil to cover the engagement for the departing colleague.

33.     On December 10, 2024, while Plaintiff was already in Brazil serving the customer, Brown called him to confront him about the trip. During the call, Brown admitted she had not read Plaintiff's advance notification email. Despite this, Brown asserted that Plaintiff had violated a travel policy and demanded he take "full accountability."

34.     During the same call, Brown also raised an entirely separate and unrelated matter—alleged late submission of materials for an external conference months earlier—and characterized both incidents together as evidence of a "pattern" of not following policies.

35.     That same day, Brown sent a written communication to Plaintiff, copying Dauphinée and Catherine Vu, characterizing the alleged travel policy violation as "a pattern of behavior" that "should not be taken lightly." No formal corrective action under Google's disciplinary policy was ever issued in connection with the trip. The conference allegation in the email was factually false: Plaintiff submitted his conference proposal months in advance and received approval through proper channels, as documented by the approved submission on file.

### G.    Plaintiff's Formal Complaint, the HR Investigation, and Termination

36.    On December 18, 2024, Plaintiff responded to Brown's email by writing directly to Dauphinée and Vu—deliberately removing Brown from the chain—and providing a detailed rebuttal demonstrating that Brown's accusations were factually false and that her conduct constituted a consistent pattern of misrepresentation and retaliation. Plaintiff expressly requested a formal investigation.

37.    Google's Employee Relations ("ER") team opened a formal investigation into Plaintiff's complaints and interviewed Plaintiff regarding his claims on January 16, 2025.

38.    On January 23, 2025—one day before ER interviewed Brown in connection with the investigation of Plaintiff's complaints—Brown submitted to Google's online performance tool a second consecutive downgraded "Moderate Impact" annual rating for Plaintiff.

39.    Brown did not disclose the second "Moderate Impact" rating to Plaintiff when she submitted it. On February 3, 2025, Plaintiff asked Brown in writing to send his rating ahead of their scheduled review meeting. Brown declined the following day, writing on February 4, 2025 that she preferred "to follow the standard GRAD process recommended to managers of sharing the rating and feedback in a live meeting," and stating: "Let's wait to meet live to do that." Brown thus withheld the rating from Plaintiff during the very period in which his termination was being approved, and the rating was first disclosed to Plaintiff only in the February 6, 2025 meeting in which he was terminated.

40.    ER closed the investigation and deemed Plaintiff's complaints "unsubstantiated." The investigation nonetheless resulted in coaching delivered to Brown concerning her "racists in her family" comments and her failure to appropriately escalate Plaintiff's bias concerns. In delivering the investigation's findings, Google's investigator acknowledged that managers are

obligated to escalate concerns of bias "even if the Googler says at the time, maybe I don't want those concerns raised," and that Brown's failure to do so was a "misstep" that "could have impacted the relationship" with Plaintiff and contributed to "the breakdown of trust."

41.    Two days after ER counseled Brown on February 3, 2025, Brown submitted a request to terminate Plaintiff. Brown submitted the written "Request to Terminate" on February 5, 2025, and Matt Dauphinée and HR Director Lauren Florendo quickly approved the request.

42.    The stated justification in the Request to Terminate rested on a false account of Plaintiff's conduct. The memorandum asserted that Plaintiff "did not acknowledge" violating the travel policy "nor did he state that he was going to follow the travel policy moving forward." Both representations were untrue. During the December 10, 2024 call, Plaintiff had expressly taken "full accountability," acknowledged the trip was "an error on [his] part," and committed that going forward he would contact Brown and obtain her written approval before booking travel. Google's reliance on a demonstrably false account of Plaintiff's own words to justify the termination is evidence that the stated rationale was pretextual.

43.    On or about February 6, 2025, Brown informed Plaintiff that it would be his last working day at Google and that his last day of pay would be February 14, 2025. In that call, Brown expressly cited the purported travel policy violation as a basis for the decision, stating that "recently, we failed to follow a widely communicated travel policy" and that "[t]his has resulted in you receiving an M rating for the 2024 grad cycle." Plaintiff's formal separation date was on or about February 14, 2025.

44.    At no point during his employment did Google place Plaintiff on a formal Performance Improvement Plan. At no point was Plaintiff told his job was in jeopardy prior to his termination. The stated "performance" rationale for Plaintiff's termination was pretextual.

45.     Plaintiff's termination was in direct retaliation for his repeated protected complaints of racial bias and for his formal request for an investigation into Brown's retaliatory conduct.

## CAUSES OF ACTION

## COUNT I

*Retaliation in Violation of Title VII of the Civil Rights Act of 1964*
*42 U.S.C. § 2000e-3(a)*

46.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

47.     Title VII prohibits an employer from retaliating against an employee who has opposed any practice made unlawful by Title VII or who has made a charge, testified, assisted, or participated in any Title VII proceeding or investigation. 42 U.S.C. § 2000e-3(a).

48.     Plaintiff is an employee within the meaning of Title VII. Defendant is an employer within the meaning of Title VII, employing more than 500 employees.

49.     Plaintiff engaged in protected activity under Title VII both by opposing conduct he reasonably and in good faith believed constituted race discrimination and by opposing conduct he reasonably and in good faith believed constituted unlawful retaliation for that opposition. Plaintiff's protected activity included: raising concerns about his removal as the only person of color from the GPC engagement; submitting a written complaint in August 2023 identifying racial bias as a potential factor in his treatment; raising concerns directly with Brown and skip-level management on multiple occasions, including his statements to Brown on November 1 and November 15, 2024 that discrimination had played a part in his treatment, and his written statement of December 3, 2024 that he had "raised concerns about fairness in [his] evaluation, particularly given [his] diversity-related concerns"; his December 18, 2024 written complaint to

skip-level management and HR, which opposed and sought a formal investigation into what Plaintiff identified as Brown's ongoing pattern of retaliation and misrepresentation following his bias complaint; and participating in Google's ensuing Employee Relations investigation, including by appearing for his investigative interview on January 16, 2025.

50.    Defendant, through Brown and with the knowledge and participation of Google's HR and Employee Relations personnel, subjected Plaintiff to materially adverse employment actions in retaliation for his protected activity, including: cancellation of regularly scheduled one-on-one meetings; issuance of a below-expectations performance rating inconsistent with the written feedback in the review itself; escalating false and inaccurate criticism of his work performance; a pretextual confrontation over a customer-requested trip while Plaintiff was already serving the customer; a documented false accusation concerning a conference submission; and ultimately, termination of his employment.

51.    A causal connection exists between Plaintiff's protected activity and the adverse actions taken against him. Brown's own statements—that she felt "triggered" by Plaintiff's racial bias complaint and did not know how to work with him after he raised it—recited and corroborated by Google's own Employee Relations investigator, constitute direct evidence of retaliatory animus. The pattern of escalating adverse actions following each instance of protected activity, and the delivery of a second consecutive downgraded performance rating one day before Brown's own ER interview, further establish causation. The termination of Plaintiff's employment within days of closing the formal investigation into his complaints constitutes additional direct evidence of retaliation.

52.    As a direct and proximate result of Defendant's retaliatory conduct, Plaintiff has suffered and continues to suffer economic damages including lost wages, lost benefits, and lost

future earning capacity, as well as emotional distress, humiliation, and harm to his professional reputation.

53.     Defendant's conduct was willful, malicious, and carried out with reckless disregard for Plaintiff's federally protected rights, entitling Plaintiff to punitive damages.

## COUNT II

*Retaliation in Violation of 42 U.S.C. § 1981*

54.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

55.     42 U.S.C. § 1981 guarantees all persons the same right to make and enforce contracts as is enjoyed by white citizens. Section 1981 encompasses the making, performance, modification, and termination of employment contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. The Supreme Court has confirmed that § 1981 encompasses retaliation claims. CBOCS West, Inc. v. Humphries, 553 U.S. 442 (2008).

56.     Plaintiff is a Black man. As such, he is a member of a protected class under § 1981.

57.     Plaintiff and Defendant were parties to an employment contract within the meaning of § 1981.

58.     Plaintiff engaged in protected activity under § 1981 by opposing conduct he reasonably believed constituted race discrimination in the making or enforcement of his employment contract, and by opposing conduct he reasonably believed constituted unlawful retaliation for that opposition, including by raising concerns about his racially disparate treatment in the GPC engagement, submitting a written racial bias complaint in August 2023, raising concerns with management on multiple occasions, formally opposing and requesting an

investigation into Brown's retaliatory conduct in his December 18, 2024 complaint to skip-level management and HR, and participating in the ensuing Employee Relations investigation.

59.     Defendant subjected Plaintiff to the adverse employment actions described herein—including the retaliatory performance rating, escalating pretextual criticism, and ultimate termination—because of his protected activity. But for Plaintiff's protected complaints of racial bias, Defendant would not have taken these adverse actions against him. The direct evidence of Brown's retaliatory animus—her admission that Plaintiff's complaint "triggered" her and left her not knowing how to work with him, corroborated by Google's own admissions—satisfies the but-for causation standard required under § 1981.

60.     As a direct and proximate result of Defendant's retaliatory conduct, Plaintiff has suffered and continues to suffer significant economic and non-economic damages as described herein.

61.     Defendant's conduct was willful, intentional, and carried out with reckless disregard for Plaintiff's rights under § 1981, entitling Plaintiff to punitive damages without statutory cap.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE**

**COUNT III**

*Retaliation and Hostile Work Environment in Violation of the*
*District of Columbia Human Rights Act*
*D.C. Code §§ 2-1401.01 et seq.*

62.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

63.     The DCHRA prohibits employers from retaliating against any employee who has opposed any practice made unlawful under the Act, or who has filed a complaint, testified, or

assisted in any DCHRA proceeding. D.C. Code § 2-1402.61. The DCHRA is to be construed broadly in favor of the persons it is designed to protect.

64.    Plaintiff is a former employee of Google LLC and is entitled to the full protections of the DCHRA. Google LLC is an employer within the meaning of the DCHRA.

65.    As set forth above, Plaintiff engaged in protected activity under the DCHRA both by opposing conduct he reasonably and in good faith believed constituted race discrimination and by opposing conduct he reasonably and in good faith believed constituted unlawful retaliation for that opposition, including his August 2023 written complaint, his direct complaints to Brown and management, his December 18, 2024 complaint opposing and seeking investigation of Brown's retaliatory conduct, and his participation in the ensuing Employee Relations investigation.

66.    Defendant, through Brown and with the knowledge and participation of its HR and ER personnel, subjected Plaintiff to materially adverse employment actions in retaliation for his protected activity. Those actions, individually and collectively, would dissuade a reasonable employee from making or supporting a charge of discrimination.

67.    The retaliatory conduct described herein also unreasonably altered the terms, conditions, and privileges of Plaintiff's employment and created an objectively hostile work environment within the meaning of the DCHRA, as amended by the Human Rights Enhancement Amendment Act of 2022, under which harassing conduct need not be "severe or pervasive" to be actionable. Brown's admission that Plaintiff's racial bias complaint had "triggered" her, her repeated false accusations delivered to senior management, her pretextual documentation of a travel policy violation while Plaintiff was mid-trip serving a customer, and the ultimate

termination of his employment within days of closing the formal investigation created conditions that a reasonable person in Plaintiff's position would find hostile, abusive, and intolerable.

68.     As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and continues to suffer significant economic and non-economic damages.

69.     The conduct of Google LLC and its agents was willful, malicious, and executed with reckless disregard for Plaintiff's rights under the DCHRA, entitling Plaintiff to punitive damages without statutory cap.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Kingsley Madikaegbu respectfully requests that this Court enter judgment in his favor and against Defendant Google LLC, and award the following relief:

A.     Back pay, including all lost wages, bonuses, benefits, unvested equity, and other compensation Plaintiff would have received but for Defendant's unlawful retaliation;

B.     Reinstatement to Plaintiff's former position, or, if reinstatement is not practicable, front pay to compensate for the loss of future earnings;

C.     Compensatory damages for emotional distress, mental anguish, humiliation, reputational harm, and other non-economic injuries suffered as a result of Defendant's conduct;

D.     Punitive damages to punish Defendant for its willful, malicious, and reckless conduct and to deter similar conduct in the future;

E.     Reasonable attorneys' fees, costs, and litigation expenses pursuant to Title VII, 42 U.S.C. § 1988, the DCHRA, and other applicable law;

F.     Pre-judgment and post-judgment interest as permitted by law; and

G.     Such other and further relief as this Court deems just and proper.

Respectfully submitted,

/s/   Edith K. Thomas
   Michael K. Amster, Esq.
   Bar No.: 1001110
   Edith K. Thomas
   Bar Number: 496388
   ZIPIN, AMSTER & GREENBERG, LLC
   8757 Georgia Ave. Suite 400
   Silver Spring, MD 20910
   Tel: (301) 587 – 9373
   Fax: (240) 839 – 9142
   mamster@zagfirm.com
   ethomas@zagfirm.com

   Counsel for Plaintiff